MOORE, Judge.
 

 Clifton Dabbs, his wife, Joan Dabbs, and their son, Shane Dabbs (sometimes hereinafter referred to collectively as “the Dabbses”) contracted with Terry Graves to construct a building on their property for use as a costume store. The parties later experienced disagreements regarding the construction of the building, which resulted in the filing of a number of claims by the Dabbses, Graves, and certain other third parties. The Dabbses appeal from the Lauderdale Circuit Court’s judgment denying the Dabbses their requested relief.
 
 [1]
 

 Facts
 

 The Dabbses owned a building in Laud-erdale County in which they operated a costume store. In 2004, the Dabbses decided that they wanted to expand their business. Shane had plans drawn up for the project; his design for the building resembled a castle and included a store and an upper-level apartment. A friend of the Dabbses recommended Graves for the project, and Joan met with Graves to dis
 
 *546
 
 cuss the plans therefor. According to Joan, Graves’s estimate to complete the project according to the plans was too costly and they agreed not to build the apartment.
 

 There was no written contract between Graves and the Dabbses for the construction of the building. It is undisputed that only Graves and Joan were present for the discussion of the terms of their agreement. Joan testified that Graves had told her that he was licensed and bonded as a contractor; however, he did not show her a license and he did not inform her that his license was limited to the City of Florence. Graves stated that he had told Joan that he was licensed only with the city. According to Graves, he had never possessed a county or state contracting license. The Dabbses’ project was not located within the City of Florence.
 

 Graves was to remove the roof from the existing building on the property and expand the building to include a second floor. Graves testified that he was responsible only for constructing the outside of the building and was not responsible for any construction on the inside. Joan testified, however, that Graves was responsible for certain elements to be constructed on the inside of the building, including doors, stairs, and posts. Graves testified that they had agreed that Graves was to be paid $12 per square foot to complete the project. Joan stated that she had not agreed to pay Graves $12 per square foot but that, instead, Graves had told her that they would save a lot of money if they paid him by the hour; Joan testified that she and Graves had never agreed on an hourly rate. Both Graves and Joan testified that the Dabbses had agreed to pay for the materials for the project.
 

 On May 19, 2004, Joan wrote a check to Graves in the amount of $1,550. According to Joan, that amount was for Graves to get started on the project and was to be applied to Graves’s labor costs. Graves testified that that money was payment for him to tear down the preexisting building on the site.
 
 [2]
 
 Also on May 19, 2004, Joan wrote a check to United True Value (“United”), a materials supplier, in the amount of $15,000 for materials for the project.
 
 [3]
 
 According to Joan, she had given that check to Graves for the purpose of starting an account in her name at United, and she had assumed that Graves had set up an account in her name. Graves testified that he had had an account with United long before he began the Dabbses’ project and that he had had a small balance on that account before he began the Dabbses’ project. According to Graves, all the materials from United that were for the Dabbses’ project were billed to Graves under his account number and he did not open a separate account for the Dabbses’ project. Graves stated that he had asked Joan for the $15,000 check for United so that he could order materials to get started on the project and that he had delivered that check to United for the Dabbses. Jim Terry, purportedly an owner of United, testified that he had first received an order for the Dabbses’ project around May 20,
 
 *547
 
 2004. At that time, according to Terry, Graves’s account with United had a balance owing of $16,184.21, which was unrelated to the Dabbses’ project, and the $15,000 check from the Dabbses had been applied to that balance.
 

 Graves began working on the Dabbses’ project in the first week of June 2004. Joan wrote a check for $1,733.10 to Blue Star Ready Mix USA, L.L.C., for concrete on June 4, 2004; Joan testified that Graves had begun the project approximately one day before that.
 
 [4]
 
 Graves hired Tommy Whitten, a carpenter, to work with him on the project. According to Whitten, he, Graves, and another worker, Scott, had worked on the Dabbses’ project. Graves testified that his nephew and his daughter had worked on the project on and off, and there was testimony indicating that there was another employee who had worked on the project periodically. Graves testified that he had paid each of his workers in cash and that he had expended approximately $12,000 to $14,000 in paying his workers.
 

 United delivered the majority of the materials for the project directly to the job site. Graves testified that he recalled having a discussion with Joan in which he had told her that her balance with United was $26,605.23, that she needed to pay that sum so that he could order more lumber from United, and that, on June 23, 2004, she had given him a check, made out to United, in the amount of $26,605.23, which he had then delivered to United. Joan testified that she thought that, at that time, all the materials for the project had been paid for. Also on June 23, 2004, Joan wrote a check to Graves in the amount of $8,000. According to Joan, Graves had told her that he needed that amount for his labor and to pay his workers; Graves stated that he had not asked Joan for any more money for his labor since that time.
 

 At some point before Graves stopped working on the Dabbses’ project, Whitten quit working for Graves. According to Whitten, he had learned that the Dabbses, rather than Graves, were paying for the materials; he had seen Graves removing materials that had been delivered to the Dabbses’ site, and he did not want to be a part of anything illegal. Specifically, Whitten testified that he had seen Graves remove “Hardie” plank, or concrete board, plywood, and chip board from the Dabbs-es’ site. Joan and Shane testified that, on one occasion, 50 pieces of Hardie plank that had been delivered in the morning were no longer at the site later that evening. Whitten stated that he knew of two other jobs from which Graves was taking materials. Graves testified, however, that he had not removed any materials from the Dabbses’ site and that the other jobs that he was working on at that time required different materials than he was using on the Dabbses’ project.
 

 According to Joan, she and Graves had had an argument sometime in July during which she had expressed her concerns that Graves was not going to complete the project by the July 31 deadline that they had discussed. Graves left the job at the end of July. Joan testified that Graves had not completed the project at that time. According to Joan, Graves returned to the project two or three different times in August, but he did not perform any work on those occasions. Joan stated that, shortly after she and Graves had argued, Graves simply did not show up again to complete the project. Graves testified that, when he left the project at the end of
 
 *548
 
 July, he had done everything he was supposed to do pursuant to his contract with the Dabbses.
 

 On September 1, the Dabbses hired Whitten and his wife, Barbara Phares, to complete the project because, according to Joan, when Graves left the project, there were several things that needed to be completed or replaced in the building. The Dabbses paid Whitten and Phares $700 per week, and they finished the job around the second week of January 2005. Joan testified that Whitten and Phares had not done any work on the project that she had not contracted with Graves to do. Whitten and Phares testified that several things had to be finished or redone, including headers on the windows, the gutter system, bracing for the rafters, and framing and columns on the inside of the building.
 

 Joan and Shane testified that they moved into the store in the second week of January 2005 and that they reopened the store on February 1, 2005. Whitten, Phares, Joan, and Shane each testified that there were still problems that needed to be repaired at the time of the trial. Jerry Tapscott II, a licensed contractor with the State of Alabama, visited the store at Shane’s request after it reopened in February 2005; Tapscott identified several concerns with the construction of the store. Tapscott testified that, among other problems, some of the wood on the outside of the building was not properly treated, some of the trim was coming loose from the building, the second floor was not properly supported, and the Hardie plank had been improperly installed. Tapscott estimated that it would cost approximately $86,602.05 to fix the problems that existed with the construction of the store, although he admitted that that estimate was a guess because he could not accurately determine the cost of the project until he “tore into” it.
 

 Procedural History
 

 On September 24, 2004, in case number CV-04-475, Graves filed a complaint in Lauderdale Circuit Court against the Dabbses, alleging that the Dabbses owed him $48,484 plus interest for labor and services rendered pursuant to a contract for the construction of a commercial building and apartment; he also claimed a lien on the Dabbses’ property at that time and asserted a claim for quantum meruit. Graves named American General Financial Services, Inc. (“American General”), to whom the Dabbses’ property was mortgaged, as a defendant in his complaint. The Dabbses filed an answer on October 28, 2004, and, on December 29, 2004, the Dabbses filed a counterclaim against Graves, alleging that Graves had breached the contract to remodel their building, that Graves had misrepresented to the Dabbses that he was a licensed builder, that Graves had converted to his own use certain items that had been purchased by the Dabbses for the work to be done to their building, and that Graves had slandered the title to their property by wrongfully filing a lien against their property. American General also counterclaimed against Graves, asserting that Graves had wrongfully converted American General’s interest in the property and seeking an amount of the diminution in the value of its interest in the Dabbses’ property and any other relief to which it was entitled. Graves filed an answer to the Dabbses’ counterclaim on January 5, 2005.
 

 On January 19, 2005, United filed a lien against the Dabbses’ property, asserting that the Dabbses owed it $24,234.82 for materials that had been delivered to the Dabbses’ site for which United had not been paid. On January 31, 2005, the Dabbses filed an amended answer in which they asserted that the contract upon which
 
 *549
 
 Graves sought recovery was void and unenforceable pursuant to Ala. Code 1975, § 34-8-1 et seq., and that Graves’s claims were barred as a result of Graves’s failure to comply with § 34-8-1 et seq.
 

 On March 2, 2005, the Dabbses filed a motion to add Teresa Terry d/b/a United True Value
 
 [5]
 
 as a party because some, if not all, of the materials used by Graves in the construction of the store had been purchased at United, which, they asserted, is owned by Teresa Terry. On that same day, the Dabbses also filed a cross-claim against Teresa Terry d/b/a United True Value, alleging that Teresa Terry had slandered the title to their property by filing a wrongful materialman’s hen against the same. The trial court entered an order adding Teresa Terry d/b/a United True Value as a party defendant on March 4, 2005.
 

 On May 31, 2005, in case number CV-05-302, Four Tees, Inc., d/b/a United True Value
 
 [6]
 
 filed a complaint against Clifton Dabbs and Joan Dabbs, requesting a judgment against them in the amount of $24,234.82 for materials that they had received from United for which United had not been paid. That same day, in case number CV-05-303, United True Value filed a complaint against Graves, demanding a judgment in the amount of $24,234.82 with interest in satisfaction of the balance due on Graves’s account with United. On June 27, 2005, the Dabbses filed a motion to dismiss the complaint in case number CV-05-302, asserting that the claim asserted in that complaint was in the nature of a compulsory counterclaim because Teresa Terry d/b/a United True Value had been added as a party defendant in the action between Graves and the Dabbses (case number CV-04-475). On September 9, 2005, the trial court entered an order consolidating the three cases involving Graves, the Dabbses, American General, Teresa Terry d/b/a United True Value, Four Tees, Inc., d/b/a United True Value, and United True Value for purposes of discovery and trial.
 

 On September 15, 2005, Graves filed an amendment to his complaint, dismissing his quantum meruit claim against the Dabbses and substituting the amount of $40,000 for the $48,484 stated in the original complaint as the amount owed to him by the Dabbses. That same day, Graves also filed an answer to United True Value’s complaint. After the trial was completed, the trial court entered an order on October 16, 2006, in which it found in favor of the Dabbses on the claim asserted by Four Tees, Inc., d/b/a United True Value; found in favor of Teresa Terry d/b/a United True Value on the Dabbses’ counterclaim against Teresa Terry d/b/a United True Value alleging slander of title; found in favor of United True Value on its claim against Graves and awarded it $42,293.16 in damages; and found in favor of Graves against the Dabbses on Graves’s breach-of-contract claim and awarded him $30,000 in damages. On October 25, 2006, the Dabbses filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial. Graves filed a response to that motion on December 19, 2006. On December 27, 2006, the trial court entered an order denying the Dabbses’ post-judgment motion. The Dabbses filed a notice of appeal to the Alabama Supreme Court on February 6, 2007; that court transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7.
 

 On November 6, 2007, this court dismissed the Dabbses’ appeal as being from a nonfinal judgment because the Dabbses’
 
 *550
 
 counterclaim against Graves and the counterclaim filed by American General against Graves had not been adjudicated.
 
 [7]
 

 See Dabbs v. Four Tees, Inc.,
 
 984 So.2d 454 (Ala.Civ.App.2007).
 

 On January 17, 2008, the trial court entered an order denying the Dabbses’ counterclaim against Graves and denying American General’s counterclaim against Graves. The Dabbses filed a motion to alter, amend, or vacate the trial court’s January 17, 2008, judgment or, in the alternative, for a new trial on January 23, 2008; the trial court denied that motion on February 8, 2008. The Dabbses appealed to the Alabama Supreme Court on March 6, 2008; that court subsequently transferred the appeals to this court, pursuant to § 12-2-7. The appeals have been consolidated.
 

 Standard of Review
 

 “ ‘When ore tenus evidence is presented, a presumption of correctness exists as to the trial court’s findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.
 
 J & M Bail Bonding Co. v. Hayes,
 
 748 So.2d 198 (Ala.1999);
 
 Gaston v. Ames,
 
 514 So.2d 877 (Ala.1987). When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court “will assume that the trial judge made those findings necessary to support the judgment.”
 
 Transamenca Commercial Fin. Corp. v. AmSouth Bank,
 
 608 So.2d 375, 378 (Ala.1992). Moreover, “[u]nder the
 
 ore tenus
 
 rule, the trial court’s judgment and all implicit findings necessary to support it carry a presumption of correctness.”
 
 Transamerica,
 
 608 So.2d at 378. However, when the trial court improperly applies the law to [the] facts, no presumption of correctness exists as to the trial court’s judgment.
 
 Allstate Ins. Co. v. Skelton,
 
 675 So.2d 377 (Ala.1996);
 
 Marvin’s, Inc. v. Robertson,
 
 608 So.2d 391 (Ala.1992);
 
 Gaston,
 
 514 So.2d at 878;
 
 Smith v. Style Advertising, Inc.,
 
 470 So.2d 1194 (Ala.1985);
 
 League v. McDonald,
 
 355 So.2d 695 (Ala.1978). “Questions of law are not subject to the ore tenus standard of review.”
 
 Reed v. Board of Trustees for Alabama State Univ.,
 
 778 So.2d 791, 793 n. 2 (Ala.2000). A trial court’s conclusions on legal issues carry no presumption of correctness on appeal.
 
 Ex parte Cash,
 
 624 So.2d 576, 577 (Ala.1993). This court reviews the application of law to facts de novo.
 
 Allstate,
 
 675 So.2d at 379 (“[Wjhere the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court’s judgment carries no presumption of correctness.”).’ ”
 

 Farmers Ins. Co. v. Price-Williams Assocs., Inc.,
 
 873 So.2d 252, 254-55 (Ala.Civ.App.2003) (quoting
 
 City of Prattville v. Post,
 
 831 So.2d 622, 627-28 (Ala.Civ.App.2002)).
 

 Discussion
 

 The Dabbses first argue that the trial court erred in awarding $30,000 to
 
 *551
 
 Graves on his breach-of-contract claim because, they say, Ala.Code 1975, § 34-8-1 et seq., precludes Graves from recovering a judgment against the Dabbses. Section 34-8-l(a) provides:
 

 “For the purpose of this chapter, a ‘general contractor’ is defined to be one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more, shall be deemed and held to have engaged in the business of general contracting in the State of Alabama.”
 

 “If any person performs work within [the definition of ‘general contractor’ as set out in § 34-8-l(a), Ala.Code 1975,] and fails to obtain a general contractor’s license, the contract must be declared null, void, and unenforceable.”
 
 Herbert v. Birmingham-Jefferson Civic Ctr. Auth.,
 
 694 F.2d 240, 241 (11th Cir.1982). Graves testified that he was a licensed contractor with the City of Florence but that he had never had a county or state license.
 
 See
 
 Ala.Code 1975, § 34-8-2 (indicating that a
 
 state
 
 license is what is contemplated in § 34-8-1 et seq.). Joan testified that the project site was not located within the City of Florence.
 

 The Dabbses argue that the cost of Graves’s labor alone brings Graves within the ambit of § 34-8-1. It was undisputed at trial that the Dabbses had paid Graves $8,000 on June 23, 2004, for labor. The Dabbses maintain that the $1,550 check given to Graves on May 19, 2004, was for labor to get Graves started on their project. Graves, however, testified that the $8,000 payment was the only payment he had received for his labor. Graves testified that he and Joan had agreed that Graves would be paid $12 per square foot, that the project involved 3,816 square feet, and, thus, that his total labor costs were $45,792. After deducting the $8,000 that the Dabbses and Graves agreed had been paid to Graves for labor, Graves requested an additional $37,792 from the Dabbses for labor.
 

 The Dabbses argue further that Graves received the benefit of overpayments made by the Dabbses to the suppliers, including $7,000
 
 [8]
 
 to Secondary Metals, Inc., and $2,718.14 to United, which, when combined with the amount that Graves claimed for his labor, would exceed $50,000. With regard to the payment to Secondary Metals, evidence was presented indicating that Graves presented a handwritten list to the Dabbses of certain materials purchased from Secondary Metals and the respective costs of those materials; the cost of the materials listed totaled $994.70.
 
 [9]
 
 An invoice from Secondary Metals dated June 25, 2004, however, was also presented; the June 25, 2004, invoice includes an additional line of items that Graves argues accounted for the remaining $7,000 that was paid to Secondary Metals.
 
 [10]
 
 Graves testi
 
 *552
 
 fied that the materials listed on that invoice had been used for roofing on the Dabbses’ project.
 

 The trial court did not make specific findings of fact in the present case.
 

 “[Wjhere a trial court’s judgment in a nonjury case is based on ore tenus testimony, the court’s findings of fact are presumed correct, and the judgment will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.
 
 McDonald v. Schwartz,
 
 706 So.2d 1230 (Ala.Civ.App.1997). Further, this court has stated that ‘[w]hen the trial court does not make specific findings of fact, this court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.
 
 Etno, Inc. v. Rivers,
 
 644 So.2d 3 (Ala.Civ.App.1994).’
 
 Simmons v. Woerner Bros. P’ship,
 
 674 So.2d 588, 589 (Ala.Civ.App.1995).”
 

 BSI Rentals, Inc. v. Wendt,
 
 893 So.2d 1184, 1186 (Ala.Civ.App.2004). Because it appears that a finding that the Dabbses overpaid $7,000 to Secondary Metals would be against the great weight of the evidence, we decline to credit that amount toward the “cost of the undertaking” for purposes of the application of § 34-8-1. Because the $2,718.14 that the Dabbses argue they overpaid to United would not, when combined with the $45,792 cost of Graves’s labor, bring the “cost of the undertaking” to $50,000 or more, we decline to address that issue.
 

 Relying on
 
 Thomas Learning Center, Inc. v. McGuirk,
 
 766 So.2d 161 (Ala.Civ.App.1998), the Dabbses further assert that the cost of materials from United, Secondary Metals, and Blue Star Ready Mix, which, the Dabbses argue, were charged on Graves’s account and were ordered by Graves, are to be included in the “cost of the undertaking.” In
 
 Thomas,
 
 this court determined that the “cost of the undertaking” for purposes of § 34-8-1 was within $20,000
 
 [11]
 
 when MeGuirk, the builder, had told the Thomases that he had his own architect and then purported to execute one contract for building an addition to a day-care center in the amount of $19,610 and a separate contract for drawing services in the amount of $390. The contract for the project provided that the job consisted of a separate contract for drawing services and designated the $390 as a “drafting fee.” In concluding that the builder was bound by § 34-8-1, this court stated, in pertinent part:
 

 “The Alabama Supreme Court has not been presented with a case in which it has had to decide whether the ‘cost of the undertaking’ includes only the sum that the contractor is to receive for
 
 his
 
 work, or whether it also includes amounts that others over whom the contractor exercises some degree of control are due to receive for
 
 their
 
 work. Courts in other jurisdictions have held that if the contractor retains control over subcontractors or over purchases passing through his accounts, then the owner’s payments for those expenditures add to the ‘cost of the undertaking’ and, if the payments meet the statutory threshold, they make the contractor subject to the general-contractor licensing requirements.
 
 See, e.g., Spears v. Walker,
 
 75 N.C.App. 169, 330 S.E.2d 38 (1985);
 
 Fulton v. Rice,
 
 12 N.C.App. 669, 184 S.E.2d 421 (1971).
 

 
 *553
 
 “In
 
 Spears,
 
 the North Carolina Court of Appeals, construing a statute virtually identical to § 34-8-1, held:
 

 “ ‘In interpreting [the general-contractor licensing statutes] and ascertaining the extent to which an undertaking and its cost should be attributed to a particular contractor, the courts in North Carolina have focused on the control exercised by the contractor over the project.’
 

 “In
 
 Fulton,
 
 the North Carolina court rejected an owner’s argument that additional payments it made to third parties, pursuant to agreements outside the scope of its agreement with the contractor, should be included to bring the ‘cost of the undertaking’ up to the statutory threshold. The court explained that the cost of a contractor’s undertaking is limited to those payments that he, or someone over whom he has control, receives.
 

 “Applying the foregoing principles of law to the undisputed facts of this case, we think it is clear that the cost of McGuirk’s undertaking was $20,000 rather than $19,610. McGuirk told the Thomases that he had ‘his own architect,’ Bennie Freed of BAF Drafting, who would design the addition. The record does not disclose the contractual arrangements between McGuirk and Freed, but it is apparent that it was McGuirk — not the Thomases — who engaged Freed’s services and negotiated his fee. Despite the fact that Freed’s $390 fee was designated as a payment arising out of a ‘separate contract for drawing services,’ it is evident that McGuirk — not the Thomases — exercised control over the design phase of the contract....
 

 “Our supreme court has held that § 34-8-1 is not a law enacted solely for revenue purposes, but is, instead, regulatory legislation designed to protect the public against incompetent contractors and to assure properly built structures that are free from defects and dangers to the public.
 

 “ ‘In 1935, the legislature first enacted what is now codified at Code 1975, § 34-8-1 et seq., in order, primarily, “to protect the public against incompetent contractors for certain type structures, which [are] free from defects and dangers to the public.”
 
 Cooper v. Johnston,
 
 283 Ala. 565, 567, 219 So.2d 392, 394 (1969). Indeed, the
 
 Cooper
 
 Court, after studying the original act and the subsequent legislation amending the act, held that the act appearing at § 34-8-1 et seq. was enacted “for regulation and protection as distinguished from a law created solely for revenue purposes.”
 
 Cooper,
 
 283 Ala. at 567, 219 So.2d at 394.’
 

 “J
 
 & M Industries, Inc. v. Huguley Oil Co.,
 
 546 So.2d [367] at 368 [ (Ala.1989) ].
 

 “We conclude that the $390 ‘drafting fee’ for Bennie Freed must be included in the ‘cost of [McGuirk’s] undertaking’ so as to bring McGuirk within the requirements of the general-contractor licensing statutes. A contrary holding would encourage unscrupulous contractors to avoid the requirements of the licensing statute by designating payments to subcontractors and suppliers as incident to ‘separate contracts.’ Our supreme court has stated:
 

 “ ‘The importance of the regulatory nature of the statute, and the protection it affords the citizens of Alabama, cannot be avoided by unlicensed contractors who, through creative schemes, seek to circumvent the requirements of § 34-8-1 et seq.’
 

 “Med Plus Properties v. Colcock Constr. Group, Inc.,
 
 628 So.2d 370, 374 (Ala.1993).”
 

 
 *554
 

 Thomas,
 
 766 So.2d at 168-70 (footnote omitted).
 

 Graves argues that the Dabbses were to provide and pay for all materials used on their project, that the checks written for the materials used on the project were made out to the suppliers directly and not to Graves, and that there is no evidence indicating that Graves had any control over the suppliers of the materials in the present case. Thus, Graves argues that, based on the discussion of
 
 Fulton v. Rice,
 
 12 N.C.App. 669, 184 S.E.2d 421 (1971), and
 
 Spears v. Walker,
 
 75 N.C.App. 169, 330 S.E.2d 38 (1985), in
 
 Thomas,
 
 which focuses on the contractor’s control over the project, the cost of the materials in the present case should not be included in the “cost of the undertaking.” We disagree.
 

 In
 
 Fulton,
 
 the landowner entered into a written contract with the builder to erect a precut log cabin; the contract stated that the owner would provide all materials, including the structure, but excluding miscellaneous materials that the builder was to provide. 12 N.C.App. at 669-70, 184 S.E.2d at 421. The court determined that, because the builder had “no control over the purchase of materials or other expenses which the owner might incur and no way of insuring that he did not exceed the statutory cost limitation and thus fall within the definition of a general contractor,” he was not within that definition. 12 N.C.App. at 672, 184 S.E.2d at 423. In
 
 Spears,
 
 the court determined that, unlike in
 
 Fulton,
 
 the builder retained control over the purchase of materials through his bank account and accounts with the suppliers, that the builder “exercised a substantial degree of control by his supervision of construction, his purchase of materials and his selection of material suppliers,” and it affirmed the trial court’s determination that the builder fell within the definition of a general contractor. 75 N.C.App. at 172, 330 S.E.2d at 40.
 

 In the present case, as in
 
 Spears,
 

 [12]
 

 Graves selected the suppliers and the materials to be used in the project, he maintained the accounts with the suppliers in his own name, and he remained in control of the purchases of materials. Both Graves and Joan testified that Graves ordered materials and would later approach the Dabbses requesting a check for the amounts due for the materials and that Joan would write a check to the suppliers, which Graves would then deliver to the suppliers. Graves and Jim Terry both testified that the account for the project with United was in Graves’s name. The Dabbses did not receive invoices for the materials from Graves and did not see the invoices until Joan and Graves began having disagreements about the project and she contacted United for copies of the receipts for their materials. Unlike in
 
 Fulton,
 
 the Dabbses did not select or order the materials to be used in the project; Graves was in full control of the materials. Although the Dabbses agreed to pay for the materials for the project, the attempt to categorize the purchase of the materials as a separate transaction from Graves’s contract to build the Dabbses’ project, like the attempt to separate the “design fee” from the building contract in
 
 Thomas,
 
 cannot succeed. We conclude, based on
 
 Thomas,
 
 that Graves cannot circumvent the requirements of § 34-8-1 by virtue of the fact that the Dabbses’ checks were made directly to the material suppliers although he retained control of the pur
 
 *555
 
 chase of materials. As a result, the amounts paid for materials to the suppliers by the Dabbses, including $7,994.70 to Secondary Metals, approximately $41,605.23 to United, and $1,733.10 to Blue Star Ready Mix, are to be included in the “cost of the undertaking” for purposes of § 34-8-1. The addition of those amounts to that requested by Graves for his labor brings the cost of the undertaking to an amount well above $50,000, and, therefore, we conclude that Graves was performing the work of a general contractor within § 34-8-1. Because Graves was not a licensed contractor at the time that he performed the work for the Dabbses, their oral contract for the construction of the project is unenforceable. As a result, we reverse that portion of the trial court’s judgment finding in favor of Graves on his breach-of-contract claim against the Dabbses.
 
 [13]
 

 The Dabbses next argue that the trial court erred in failing to award damages to the Dabbses for breach of the contract by Graves. The Dabbses argue that the testimony by Whitten, Phares, and Tapscott, in addition to other evidence supporting their assertion that Graves’s work was substandard, which they say Graves did not refute with expert testimony, supports a finding that Graves’s actions constituted a breach of contract for which the Dabbses should be awarded the reasonable value of the extra work necessary to correct the defects in Graves’s work.
 

 It was undisputed at trial that only Graves and Joan were present when the stipulations of the contract were discussed and that there was no written agreement. Both Graves and Joan stated that, pursuant to their agreement, Graves was supposed to pour the concrete that was to be added to the front of the existing building to make the towers and that he was supposed to add a second floor and install a new roof on the existing building. Joan testified that Graves was also supposed to build a front door and a back door, to build stairs to the second floor of the building, to place posts and a bannister on the stairs, and to cut a doorway out-of the concrete blocks that separated the apartment portion of the building from the store portion. According to Graves, he and Joan had agreed that Graves was to construct the outside of the building and that he was not responsible for any construction on the inside of the building.
 

 Evidence was presented at trial regarding a number of problems with Graves’s construction. According to Whitten, when he took over the job, he reinstalled the headers for the windows and the bracing for the rafters because Graves had improperly constructed those items. Graves testified that the entire building was “a foot out of square,” that the Dabbses were aware of that problem, and that they had told him to do the best that he could to make it work. Graves stated that the whole building was uneven and that he had “shimmed it up” everywhere to make it work. Graves stated that the floor was three or four inches out of level because it was set on a grade but that he had raised the window level.
 

 Tapscott testified that a girder, which was supporting the main upstairs floor, and the attached floor joists had been improperly installed, which was causing the main upstairs floor to sag. When asked if
 
 *556
 
 he was aware that the Dabbses had had to “jack up” support for the top floor because it was sagging and was not properly supported, Graves stated that it had been correctly done when he had left the job and that, if it was sagging, that was an indication that the concrete slab the Dabbses had wanted to build on had not been done correctly and that he had had no part in installing that concrete slab.
 

 The testimony of Whitten, Phares, Joan, and Shane indicated that Graves had installed a PVC pipe as a gutter and that, as a result, water had leaked into the building, damaging the sheet rock and the paint, and that Joan had purchased the materials for Whitten to replace the PVC pipe with a “proper gutter system.” Graves, however, testified that he had replaced the PVC pipe he had originally installed with a larger PVC pipe and that it had been draining properly and was not leaking when he left the project.
 

 Whitten also testified that Graves had improperly installed the Hardie plank, or concrete board, by putting a space between the planks with a nail and trying to caulk the spaces when the planks should have been butted together with caulk between the planks; as a result, according to Whitten, the Hardie plank was cracking apart and pulling up. Tapscott also testified that he had observed Hardie plank that had been improperly installed because it was overlapping where it should have been attached with a small seam of caulk. Graves testified that an employee of United, where he had purchased the materials, had instructed him that there was supposed to be a one-eighth-inch space between the boards, that he had sealed those boards, and that the Dabbses had been responsible for painting over them to seal them further. Joan testified that Graves had told them that they could either paint the Hardie plank or leave it natural.
 

 Phares testified that Graves had improperly framed the upstairs portion of the project and that she and Whitten had had to take the headers down and had had to rework the columns on the inside to make the repairs. Graves testified that he had installed the columns inside the building and had divided off all of the rooms at the Dabbses’ request and that he had completed both of those projects as the Dabbses had requested. Joan testified that Whit-ten had had to replace the window casings that Graves had installed because she had wanted a post instead. Joan also testified that Graves had built stairs to the second floor inside the building but that they had not been properly supported and had had to be replaced.
 

 At trial, Joan testified that Graves had essentially done the things that he was supposed to do pursuant to them contract but that he had performed the job poorly and that much of his work had had to be replaced. She stated that she had paid Whitten and Phares approximately $12,124 to complete the project and that they had not done any work that she had not contracted with Graves to do. The Dabbses opened the store in February 2005 after Whitten and Phares had completed their work on the project. Tapscott, who visited the store after it had been reopened, testified that he had observed several other problems with the construction of the building, including loose trim and improper truss installation. Tapscott estimated that it would cost approximately $36,602.05 to repair all the problems with the building, although he admitted that that estimate was a guess because he would not know what needed to be done until he “tore in” to the project.
 

 The Dabbses also assert on appeal that Graves removed materials from their
 
 *557
 
 project that the Dabbses had paid for.
 
 [14]
 
 Whitten and Phares both testified that they had seen materials removed from the Dabbses’ project by Graves, including wood, chip board, and Hardie plank. Joan and Shane also testified that Graves had removed approximately 50 panels of Har-die plank from the site. Evidence was presented indicating that, at the time he was working on the Dabbses’ project, Graves was on “suspended work release” as a result of having received stolen property in 2000. Graves testified, however, that he had not taken any materials from the Dabbses’ job site. Whitten, Phares, Joan, and Shane each admitted that they were not sure whether Graves had returned with the materials that he had allegedly removed.
 

 Graves testified that, during the time he was working on the Dabbses’ project, the Dabbses had never complained to him about the way he was constructing the building and that, after he left in August, they had not contacted him about any complaints they had with the construction. According to Joan, in July 2004, while Graves was still working on the project, she had hired Graves to install a deck around a swimming pool at her residence. Graves testified that, at the time he left the Dabbses’ project, he had completed everything that he was supposed to under the terms of the contract. Jim Terry testified that he had been to the Dabbses’ site in August 2004, after Graves had left the job, and that the outside of the building “was pretty well completed.”
 

 The determination of the terms of an oral contract is for the trier of fact.
 
 Black Diamond Dev., Inc. v. Thompson,
 
 979 So.2d 47, 52 (Ala.2007). “Whether a party has substantially performed a promise under a contract is a question of fact to be determined from the circumstances of each case.”
 
 Cobbs v. Fred Burgos Constr. Co., 477
 
 So.2d 335, 338 (Ala.1985).
 

 “The ore tenus rule recognizes that the trial judge is better able than is the appellate court to determine the credibility of the witnesses. The trial judge has the discretion of accepting or rejecting testimony of a witness and of giving appropriate weight to testimony because he or she is in a better position to consider the demeanor of the witness and that witness’s candor and/or evasion. If the judge has determined that a witness has lied or is lying under oath, he or she can take that fact into consideration when weighing other evidence presented by that witness.
 
 See James v. James,
 
 532 So.2d 1031 (Ala.Civ.App.1988).”
 

 DiIorio v. Long,
 
 839 So.2d 650, 654 (Ala.Civ.App.2001).
 

 In the present case, there was competing evidence presented regarding both the terms of the contract between Graves and the Dabbses and Graves’s performance under that contract; the determination of both was in the trial court’s discretion. Although the trial court did
 
 *558
 
 not make written findings of fact, we must assume that the trial court made those findings necessary to support its judgment, and we must view the evidence in a light most favorable to the prevailing party.
 
 Pattans Ventures, Inc. v. Williams,
 
 959 So.2d 115, 120 (Ala.Civ.App.2006). “ ‘Even if this court may have decided differently, it is not [this court’s] function to reweigh the evidence or to substitute its judgment for that of the trial court.
 
 James v. James,
 
 582 So.2d 560 (Ala.Civ.App.1991).’” McIv
 
 er v. Bondy’s Ford, Inc.,
 
 963 So.2d 136, 141 (Ala.Civ.App.2007) (quoting
 
 Dees v. Dees,
 
 628 So.2d 945, 947 (Ala.Civ.App.1993)). Because the trial court could have determined that Graves had performed his obligations according to the oral contract with the Dabbses, we must affirm the trial court’s decision not to award damages to the Dabbses for breach of contract.
 

 The Dabbses last argue that the trial court erred in finding no slander of title by Teresa Terry d/b/a United True Value or by Graves. The cause of action for slander of title is grounded in Aa.Code 1975, § 6-5-211, which provides that “[t]he owner of any estate in lands may commence an action for libelous or slanderous words falsely and maliciously impugning his title.”
 

 “ ‘The elements of a slander of title action are:
 

 “ ‘ “ (1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiffs property or the title thereof; and (6) that special damages were the proximate result of such publication (setting them out in detail).” ’
 

 “Merchants Nat’l Bank of Mobile v. Steiner,
 
 404 So.2d 14, 21 (Ala.1981) (quoting
 
 Womack v. McDonald,
 
 219 Ala. 75, 76-77, 121 So. 57, 59 (1929)).”
 

 Folmar v. Empire Fire & Marine Ins. Co.,
 
 856 So.2d 807, 809 (Ala.2003). “The act against which a slander-of-title action is taken must have been false
 
 and
 
 malicious when it was performed.”
 
 Folmar,
 
 856 So.2d at 809.
 

 “Malice does not equate with negligence.
 
 Alabama Power Co. v. Laney,
 
 428 So.2d 21 (Ala.1983). Malice requires ‘proof that [the defendant] intentionally disparaged [the] plaintiffs title to the property slandered or
 
 recklessly
 
 disparaged [it]
 
 without information sufficient to support a bona fide belief’
 
 in the veracity of the disparaging statement.
 
 Harrison v. Mitchell,
 
 391 So.2d 1038, 1041 (Ala.Civ.App.1980) (emphasis added). In other words, ‘if the defendant had probable cause for believing the statement, there can
 
 in law
 
 be no malice.’
 
 [Merchants Nat’l Bank of Mobile v.] Steiner,
 
 404 So.2d [14] at 21 [ (Ala.1981) ] (emphasis added).”
 

 Roden v. Wright,
 
 646 So.2d 605, 611 (Ala.1994). The Dabbses have not presented an argument on appeal, and we can find no evidence in the record, to support an assertion that either Graves or Teresa Terry d/b/a United True Value maliciously filed their respective liens on the Dabbses’ property. On the contrary, Jim Terry testified that United had not received payment for materials that United had delivered to the Dabbses’ project. Ater learning at trial that the Dabbses had paid for the majority of those materials, United released its lien on the Dabbses’ property, further indicating the absence of malice in initially filing that lien. Graves also maintained throughout the trial in the present case that the Dabbses owed him for his labor in completing the building, and he
 
 *559
 
 presented evidence in support of that claim, evidencing his belief that the lien was legitimate and that he did not file for the lien with malice. Because the Dabbs-es have failed to present any evidence tending to show that either Teresa Terry d/b/a United True Value or Graves acted with malice in filing their respective liens, we conclude that the trial court did not err in resolving the Dabbses’ slander-of-title claims against the Dabbses.
 

 Based on the above-stated reasoning, we affirm those portions of the trial court’s judgment finding in favor of Graves on the Dabbses’ counterclaim for breach of contract and finding in favor of Graves and Teresa Terry d/b/a United True Value on the Dabbses’ slander-of-title claims. We reverse that portion of the trial court’s judgment finding in favor of Graves on his breach-of-contract claim against the Dabbses and awarding him damages, and we remand the cause for the entry of a judgment consistent with this opinion.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 [1]
 

 . Initially, there were three separate actions in the trial court (case no. CV-04-475, case no. CV-05-302, and case no. CV-05-303); the trial court consolidated those actions. The trial court entered one judgment, and the Dabbses filed a single notice of appeal; three different appeal numbers were assigned to correspond to the three separate case numbers in the trial court (appeal no. 2070630— case no. CV-04-475; appeal no. 2070631— case no. CV-05-302; and appeal no. 2070632 — case no. CV-05-303). The style of these appeals reflects the parties, and the alignment of the parties, as listed on the Dabbses' notice of appeal.
 

 [2]
 

 . Graves laler testified that he had constructed the store from an existing building and that he had removed the roof from that building but had not torn down the existing building.
 

 [3]
 

 . Several filings in this case name Teresa Terry d/b/a United True Value, United True Value, and Four Tees, Inc., d/b/a United True Value as parties. It is unclear from the record what the relationship is between those entities; however, for the remainder of this opinion, the party names have been listed in full as they appear on the pleadings and any reference to “United” alone refers to the business from which the materials for the Dabbs-es' project were purchased.
 

 [4]
 

 . It appears from Graves's and Joan’s testimony that Graves began the project by removing the roof from the existing building and that he then began pouring concrete in the front of the building to create the “towers” for the castle.
 

 [5]
 

 .
 
 See
 
 note 3,
 
 supra.
 

 [6]
 

 .
 
 See
 
 note 3,
 
 supra.
 

 [7]
 

 . This court had remanded the case to the trial court for the trial court to enter an order either certifying its October 16, 2006, order as a final judgment in compliance with Rule 54(b), Ala. R. Civ. P., or adjudicating the remaining claims in the case. Following the remand of the case. Graves had filed a motion to dismiss American General "as party defendant,” which was granted by the trial court. This court, however, determined that that dismissal of American General as a "party defendant” did not dispose of American General's counterclaim against Graves.
 
 See Dabbs v. Four Tees, Inc.,
 
 984 So.2d 454, 456 (Ala.Civ.App.2007).
 

 [8]
 

 . Although the Dabbses argue in their brief to this court that the alleged overpayment to Secondary Metals was in the amount of $4,000, which amount they arrived at by subtracting $994 from $4,994, the evidence adduced at the trial reveals that the check to Secondary Metals was in the amount of $7,994, and that the alleged discrepancy was for $7,000 rather than $4,000.
 

 [9]
 

 . Although the actual total of the materials listed is $994.70, the document itself reflects a handwritten total of $7,994.70.
 

 [10]
 

 . The additional line of items appears at the top of the Secondary Metals invoice. Furthermore, there is a small mark above the first of the materials listed on the handwritten list Graves provided to the Dabbses that sug
 
 *552
 
 gests that there was an additional line of writing on that list that was not photocopied.
 

 [11]
 

 . At the time
 
 Thomas
 
 was decided, the "cost of the undertaking” limitation in § 34-8-1 was $20,000 rather than $50,000.
 

 [12]
 

 . Although we recognize that the holdings in these North Carolina cases are not binding precedent in Alabama courts, they are discussed alongside
 
 Thomas
 
 to further develop the analysis in
 
 Thomas
 
 and to address the arguments raised by Graves on appeal regarding the relation of their holdings to the present case.
 

 [13]
 

 . Because we are reversing the trial court’s judgment in favor of Graves on his breach-of-contract claim against the Dabbses, we decline to address the Dabbses’ arguments that Graves engaged in being a "residential home builder” under Ala.Code 1975, § 34-14A-5, and that the trial court erred in awarding Graves a judgment for $30,000 "where the damages, at best, were speculative.”
 

 [14]
 

 . The Dabbses had filed claims against, and sought damages from, Graves for both breach of contract and conversion. On appeal, the Dabbses do not posit the denial of their conversion claim against Graves as a separate issue, but they have cited Graves’s removal of materials delivered to their job site as a problem with Graves’s construction alongside other problems that, they say, amounted to a breach of contract by Graves. Because the Dabbses do not argue on appeal that the trial court erred in adjudicating their conversion claim in favor of Graves, they have waived any argument relating to that claim, and we decline to address the issue of conversion by Graves.
 
 See
 
 Rule 28(a), Ala. R.App. P. Any discussion of Graves’s alleged removal of materials from the Dabbses’ site is in an effort to thoroughly address the Dabbses’ arguments that Graves was in breach of the contract.