THOMAS, Judge,
dissenting.
I respectfully dissent. I disagree that the juvenile court did not have before it clear and convincing evidence of grounds, other than the alleged sexual abuse of the child by the father, upon which it could have found that the child was dependent. Our standard of review in a dependency case in which the juvenile court heard ore tenus evidence is deferential.
“ ‘Matters of dependency and child custody are within the discretion of the trial court. Where ore tenus evidence is presented, the judgment of the trial court is presumed correct and will be reversed on appeal only upon a showing that it was plainly and palpably wrong.’ ”
L.H. v. Lee County Dep’t of Human Res., 40 So.3d 747, 749 (Ala.Civ.App.2009) (quoting F.G.W. v. S.W., 911 So.2d 1, 5 (Ala.Civ. App.2004)).
*1265 The testimony in this case was sufficient for the juvenile court to have found that the child is a danger to herself and others, that the child acts out in sexually inappropriate ways, and that the parents are not capable of providing appropriate supervision and care for the child, providing sufficient support for the trial court’s determination that the child was dependent.
The mother testified that in 2004 or 2005 the child had meltdowns including one instance when the child put her head through the bedroom window, breaking it. The mother testified that the child “would just start having fits endangering her own physical body and possibly [M.H.].” The mother stated that during those meltdowns the child would be out of control and that the mother was afraid for M.H.’s safety. The mother also testified that the child would bite or scratch herself and take her feces and “smear it all over the room.”
Bobbi Mason, the house manager at the Ability Plus group home, testified that the child had exhibited self-injurious behaviors and that she had harmed other children. Mason testified that, because of the child’s tendency to harm herself, Ability Plus performs an examination of the child when she returns to the Ability Plus group home from any visitation. Mason also testified that the child would “stomp her feet until they bleed,” that she would “pick her skin until she make[s] it bleed,” and that the child was a danger to herself. According to Mason, the child “will hit younger babies,” and Mason stated that the child has an obsession with “wanting to hit a baby or wanting] to harm a baby,” that “[the child] hits younger kids,” and that the child is “pretty aggressive.” Mason further testified that the child could be dangerous to younger children. According to Mason, the father had stated that the child did not mind the mother. Mason testified regarding an incident when the child had struck her. Mason stated:
“I stood up and, I said [to the child], we do not do that. I will not hit you. You will not hit me. And [the father] answered and said she listened to you because you spoke [with] authority. With [the mother], she will just laugh about it and continue to do it, but he said she does not do me that way. And she stopped.”
Mason also testified to the child’s tendency to behave in a sexually inappropriate manner. Mason stated that the child would ask the father if he wanted “to do the hunchie” and that the child had stated that “[the father’s] peepee went in [the child’s] mouth.” Mason further testified that the child would touch herself and put her finger into her vagina.
According to Mason, there also had been problems with the parents’ visits with the child. Mason stated that at times “the [mother’s] cuddling was inappropriate” and that she “felt [there] was too much touching.” Mason further stated that the mother would get angry and speak harshly to the staff and that such harsh speaking was inappropriate in front of the child.
Rhonda Williamson, a special-education teacher at the school the child had attended, testified that the child needed one-on-one supervision because the child would act erratically and try to harm herself or others. According to Williamson, the child became focused on the youngest child in the classroom, stating that she intended to hit the other child. Williamson stated that twice the child did hit the other child. Williamson further testified that the child was a danger to children who were younger or smaller than the child.
*1266 Donna Duncan, an inclusion assistant at the school the child had attended, testified that there had been numerous episodes at school when the child had acted aggressively, had yelled curse words, or had made inappropriate, sexual comments. According to Duncan, the child would become agitated and “fixate” on younger children and talk about hurting them. Duncan testified that the child had thrown a toy at another child and had “split his eye open,” that the child had head-butted her, and that the child had “slapped [her] as hard as she could.”
According to Duncan, the child began making sexual comments one day while the child was eating a hot dog, stating that she was going to eat the hot dog “like a hoo-chie woman” and that the child began making “obscene gestures” with the hot dog. Duncan stated the child then said that she had to go to a home where a man would “whip the hell out of her” and that he had “a hoochie big thing that’s going to hold [the child] down.” According to Duncan, the child also stated that the man told her that she would “stay in the dungeon room with her daddy,” that she was not going to cry, and that the man was not going to hurt her. Duncan further testified that the child would often talk about “opening daddy’s peepee” and how the child was “not going to be afraid” and how she was “not going to tell.” Duncan stated that the child would talk in a deep, gravelly voice when making these comments. Duncan further testified that the child would touch her own genitals and would grab the genitals of other children. According to the mother, the child has engaged in inappropriate, sexually related conversations and actions for the last four or five years, beginning when the child was six or seven years old.
Amanda Bowden, another inclusion assistant at the school the child had attended, testified that the child would attempt to harm herself by trying to bite or scratch herself or by head-butting objects and that the child would take toys and “try to physically] insert them into her vagina area and push as hard as she could push.” Bowden also testified that the child would hit, kick, and attempt to bite staff members and that the child was aggressive toward other children. Bowden further testified that the child required constant supervision to prevent the child from harming the other children.
According to Melissa Nix, the nurse at the school the child had attended, the child exhibited self-injurious behaviors such as scratching and pulling her hair. Nix also testified, as had Bowden and Duncan, that the child was aggressive toward other children, stating that she had observed the child walk into the room and slap another child in the face without any provocation. Nix had also observed the child slap another child across the chest, again without any provocation.
Nix also testified that the child had told her that a man had come into her room, had thrown her bed covers and mattress to the floor, and had pulled her pants down. According to Nix, the child then “started saying uh, uh, uh and [the child had made] a thrusting motion with her hips.” Nix further testified that the child then became upset and stated that the man had hurt her, pointing to her vagina and her bottom. Nix testified that the child then said, in a different voice, that the man had told her not to tell anyone what had happened. According to Nix, the child had told her that it had been “daddy” who had come into her room. Nix stated that the child had never been alone with a man at the' school. According to Nix, the aggressive and sexualized behaviors exhibited by the *1267 child were not typical of the other autistic children that she had observed.
Dr. Edgar Finn, a psychiatrist who had treated the child from when the child was 6 years old until 2 years before the trial, testified that the child was a danger to herself and to others, including other children such as her younger sister, M.H., and that the child required close supervision. Dr. Finn stated that he was not surprised that the child had bitten her tutor and drawn blood or that the child had struck M.H. while M.H. was sleeping. According to Dr. Finn, the child was a danger to M.H. if the child was not closely supervised. In spite of the child’s aggressive behavior, the mother stated that she would sometimes take a nap during their visits with the child at the Ability Plus group home, allowing M.H. “to take charge” of the child.[19] Dr. Finn also testified that the child’s impulse-control issues could place the child’s own safety at risk.
Although Dr. Finn testified that he felt that the child was reasonably safe with the supervision being provided by the parents, Dr. Finn also testified that he was “concerned that if — in particular the mother who I worked with most of the time wasn’t able to provide that support and that limit setting and control over her behavior, I didn’t know that [the child] would be safe,” indicating his doubts that the mother could properly control the child’s behavior. The father testified that when the mother stayed home with the child and attempted to home school the child, dealing with the child and the child’s schooling was too much for the mother to handle. Additionally, the mother was absent for the final two days of the trial, in part because of her inability to cope with the additional stress of the proceeding. Dr. Finn further testified that the parents would not always take his advice regarding how to care for the child, although he stated that, in general, the parents were not “non-compliant.” The parents stated an express desire to remove the child from her current placement at the Ability Plus group home and return the child to their home, utilizing other, outside-the-home services to assist with the child’s care.
The juvenile court also heard evidence that the parents had refused to cooperate with DHR and the staff at the Ability Plus group home. Iris Johnson, a DHR case worker, testified that she had difficulty getting the parents to attend an ISP meeting. Johnson also testified that, when she went to the parents’ home for an ISP meeting, the mother became irate and she kept screaming that she would not let anyone take M.H. Johnson stated that she was allowed to see M.H.; however, Johnson was not allowed to ask M.H. any questions or see M.H. without one of the parents being present, causing Johnson to cancel the ISP meeting. According to Mason, the parents were encouraged to attend the child’s psychiatric appointments; however, the parents had only attended one appointment. The parents also had not provided any voluntary child support while the child had been in DHR’s custody and had provided only a minimal amount of clothing.
According to Latasha Hardy, a DHR social worker, the mother had become irate during one of her visits with the child at the Ability Plus group home. Hardy testified that she had received a telephone *1268 call from one of the staff at the Ability Plus group home during one of the mother’s visits. Hardy stated that she could hear the mother yelling and swearing. Hardy also testified that the child was saying “leave, mommy, just leave, mommy,” and that the child was yelling in the background the entire time. According to Hardy, Ability Plus banned the parents from the group home after that visit and required that any future visits had to take place at another location.
The juvenile court heard the testimony of the witnesses and observed their demeanor over the course of a four-day trial. It is important to remember that
“ ‘[t]he ore tenus rule recognizes that the trial judge is better able than is the appellate court to determine the credibility of the witnesses. The trial judge has the discretion of accepting or rejecting testimony of a witness and of giving appropriate weight to testimony because he or she is in a better position to consider the demeanor of the witness and that witness’s candor and/or evasion. If the judge has determined that a witness has lied or is lying under oath, he or she can take that fact into consideration when weighing other evidence presented by that witness. See James v. James, 532 So.2d 1031 (Ala.Civ.App.1988).’ ”
Dabbs v. Four Tees, Inc., 36 So.3d 542, 557 (Ala.Civ.App.2008) (quoting DiIorio v. Long, 839 So.2d 650, 654 (Ala.Civ.App.2001)).
“In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief. Ostrander v. Ostrander, 517 So.2d 3 (Ala.Civ.App.1987). Further, in determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness and the witness’s apparent candor or evasiveness. Ostrander, supra.”
Woods v. Woods, 653 So.2d 312, 314 (Ala. Civ.App.1994). “The ore tenus presumption is based on the trial court’s unique position to directly observe the witnesses and its ‘better opportunity to pass upon the credibility of their testimony.’ ” Fluker v. Wolff, 46 So.3d 942, 950 (Ala.2010) (quoting Ex parte Pielach, 681 So.2d 154, 155 (Ala.1996)).
“ ‘This court is not allowed to reweigh the evidence or to substitute its judgment for that of the trial court. Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996).’” G.H. v. EG., 909 So.2d 206, 208-09 (Ala.Civ.App.2005) (quoting Estrada v. Redford, 855 So.2d 551, 555 (Ala.Civ.App.2003)). Additionally, “ ‘[i]t is our duty to affirm the trial court’s judgment if it is fairly supported by credible evidence, “regardless of our own view of that evidence or whether we would have reached a different result had we been the trial judge.” ’ ” Sankey v. Sankey, 961 So.2d 896, 901 (Ala.Civ.App.2007) (quoting Griggs v. Griggs, 638 So.2d 916, 918-19 (Ala.Civ.App.1994), quoting in turn Young v. Young, 376 So.2d 737, 739 (Ala.Civ.App.1979)).
Mason, Duncan, Bowden, Williamson, Nix, the mother, the father, and Dr. Finn all testified regarding the child’s tendencies to harm herself and other children and Mason, Duncan, Bowden, Nix, the mother, the father, and Dr. Finn testified regarding the child’s tendencies to act out in a sexually inappropriate manner. The testimony of Dr. Finn, the father, the mother, and Mason raised a question as to whether the parents, particularly the mother, were capable of properly caring for, supervising, *1269 and controlling the child. The juvenile court also observed that the mother was absent for two of the four days of the trial. Additionally, the juvenile court also had before it the recommendation of the guardian ad litem, urging the juvenile court to find the child dependent. The juvenile court could have concluded from the evidence of the child’s self-injurious and aggressive behaviors that the child would be in danger of harming herself or M.H. if the child was returned to the parents’ home because the parents lacked the ability to sufficiently supervise the child or adequately address the child’s many special needs. I believe that this evidence was sufficient to support the juvenile court’s judgment determining that the child was dependent, and, therefore, that judgment was not plainly and palpably wrong. Thus, I would affirm the judgment of the juvenile court.
PITTMAN, J., concurs.

. The mother did state that her mother was in the room, indicating that the children were not completely lacking adult supervision.